# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Apr 27, 2021
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21 MJ 109 |
| Information associated with the Facebook page under the URL: https://www.facebook.com/Mr.Wild.Hunnitz; as more fully described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1), 21 U.S.C. § 841(a)(1)(A), 18 U.S.C. § 641 | possession of a firearm by a prohibited person, possession of a controlled substance with intent to distribute and distribution of a controlled substance, theft of government property. See attached affidavit for additional charges |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

RYAN ARNOLD
Digitally signed by RYAN ARNOLD
Date: 2021.04.27 10:38:29 -05'00'

*Applicant's signature*

ATF SA Ryan Arnold

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone/email _____ *(specify reliable electronic means)*.

Date: _____ April 27, 2021 _____

*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Ryan T. Arnold, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since April 2015. As an ATF Special Agent, I have participated in numerous investigations regarding the unlawful possession of firearms by convicted felons.  I have also conducted investigations related to the unlawful use of firearms, firearms trafficking, and arson.

3.      Prior to my employment with ATF, I was a Special Agent with the United States Secret Service (USSS) for approximately 5 years.  My duties included providing and planning dignitary protection, drafting and executing federal search warrants, investigating organized fraud networks, the use and manufacture of counterfeit currency, and other financial crimes.

4.      Prior to my tenure with the USSS, I served as a police officer with the Chicago, Illinois, Police Department (CPD).  During part of my career as a CPD Officer, I was assigned to the Organized Crime Division-Gang Enforcement Unit.  My responsibilities included the investigations of street gangs, narcotics distribution, firearms violations, robbery, home invasions, operating in an undercover capacity, and the authoring and execution of search warrants.

5.      I have received training in the investigation of federal firearms offenses and drug trafficking offenses.  I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices.  In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.  I am also familiar with the language utilized by individuals to discuss firearms and drug trafficking, and know that the language is often limited, guarded, and coded.

6.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

7.      This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

8.      Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

9.      Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

10.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) (possession of a firearm by a prohibited person), 21 U.S.C. § 841(a)(1)(A) (possession of a controlled substance with intent to distribute and distribution of a controlled substance), 18 U.S.C. § 641 (theft of government property), and 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), have been committed by Akeem HUDSON (dob: 05/03/1991), and that there is also probable cause to search the "Target Account" described below and described in Attachment A, for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## TARGET ACCOUNTS TO BE SEARCHED

- Facebook page under the URL:  https://www.facebook.com/Mr.Wild.Hunnitz

    USERNAME: King'Cesar Millan (Dawg whisper), User ID: 738415029

    Facebook ID: 738415029

## PROBABLE CAUSE

11.     Since February of 2021, case agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in coordination with the Milwaukee Police Department (MPD) and the Federal Bureau of Investigation (FBI), have been investigating identified members of the violent street gang, Wild 100s, aka, Shark Gang, including Akeem HUDSON (dob: 05/03/1991) for federal firearms offenses, drug offenses, and theft of government funds and fraud offenses.

12.     Based upon review of MPD reports, information provided by confidential sources, and review of publicly available social media posts, beginning in approximately July of 2020, members of the Wild 100s, aka Shark Gang, became involved in an ongoing feud with members of the Ghetto Boys Clique (GBC), aka Swindle Gang.  Since that time, multiple homicides, shootings, and instances of illegal possession and transfer of firearms, including the possession of fully automatic firearms, that is, machineguns, have occurred and are suspected to be associated with the ongoing gang feud.

13.     On January 26, 2019, a shooting occurred in the area of 2461 N. 33rd Street in Milwaukee, WI.  The shooting resulted in the homicide of Lawrence "Lowski" Hamilton (dob: 07/23/1992), a known Wild 100s member sustained multiple gunshot wounds.  Sometime after the funeral, the grave of Lawrence Hamilton was desecrated by members of the GBC or Swindle Gang. Your affiant knows that the grave and memorial desecration is a common way to disrespect a rival gang member and the gang itself.  In a later shooting incident, Wild 100s gang member, Ramon Savage confirmed to

interviewing MPD officers that the desecration of Hamilton's grave and memorial is what started the violent feud between the Wild 100s and GBC.

14.     Additionally, on July 23, 2020, MPD responded to numerous shots fired in the rear playground area of Maple Tree Elementary School located at 6644 N. 107th Street, Milwaukee, Wisconsin. MPD recovered 123 casings on scene in a variety of calibers. Wild 100s member, Quishawn M. Hanna was interviewed on scene by MPD officers. Hanna advised there were people there to celebrate the one (1) year anniversary of a friend's death, and people started shooting.

15.     On September 30, 2020, MPD officers responded to a shooting at the funeral for GBC gang member, Braxton Taylor. Seven victims suffered nonfatal gunshot wounds. Witnesses advised that members of the Wild 100s were making social media posts around the time of the funeral that suggested they may be involved in the shooting. Later that day there were two other shootings, one at the TAYLOR memorial near 21st Street and Center Street, in which an unintended target suffered a gunshot wound to her head, and the other in which Wild 100s members, Quiman E. Townsend (dob: 03/13/1991) and Ramon Savage (dob: 06/13/1995) suffered nonfatal gunshot wounds. Wild 100s members are suspects in the funeral home shooting and GBC members are suspects in the shooting at the Taylor memorial and shootings that wounded Townsend and Savage. Since July of 2020, case agents have identified at least 20 separate incidents of firearms violence and illegal firearms possession linked to the ongoing war between Wild 100s, aka Shark Gang, and GBC, aka Swindle Gang.

16.     In April of 2021, case agents located a Facebook page under the name King'Cesar        Millan,        Facebook        ID        #        738415029,

https://www.facebook.com/Mr.Wild.Hunnitz. Case agents obtained and compared a Wisconsin Driver's License photograph of Akeem HUDSON (dob 05/03/1991) to the photos on the publicly viewable portion of the aforementioned Facebook page. Case agents believe based upon review of the photographs, including "selfies," of the person utilizing the King'Cesar Millan page and HUDSON's driver's license photograph, that HUDSON is the person using the Facebook account under the name "King'Cesar Millan" (Dawg whisper). The below is a comparison of the driver's license photo to HUDSON's publicly viewable post, which reveal HUDSON's distinct neck tattoos.

 

(driver's license photo)      (King'Cesar Millan Facebook page "Selfie")

17.    Case agents reviewed the criminal history of HUDSON, which revealed that HUDSON is prohibited from possessing firearms based upon prior felony convictions for possession of a short-barreled shotgun and intimidation of a witness.

18.    Case agents reviewed the publicly viewable posts on the "King'Cesar Millan, (Dawg whisper)" Facebook page, which is utilized by Akeem HUDSON, and found photographs of what appears to be illegal firearms, illegal drugs, and posts

consistent with participation in fraud schemes and theft of government property. The following is a summary of some of the publicly viewable postings from the "King'Cesar Millan, (Dawg whisper)" Facebook account utilized by HUDSON.

19. On April 16, 2021, case agents reviewed the publicly available "title box" for the account, "King'Cesar Millan (Dawg whisper)," which is utilized with HUDSON. As set forth below, the school listed by HUDSON was the "Wild Hunnitz Academy." Based upon their training, experience, and the investigation to date, case agents believe that HUDSON listed the "Wild Hunnitz Academy" on his Facebook page, "King'Cesar Millan (Dawg whisper)," as a way to publicly identify himself as a member of the Wild 100s street gang.



20. On November 18, 2019, the Facebook page, "King'Cesar Millan (Dawg whisper)," made the following post with the caption, "I need 20 a joint real deals with the gold flask." Case agents are aware based upon training, experience, and the investigation to date, that "20 a joint" means $20 per ecstasy pill.



21.     On November 23, 2019, the "King'Cesar Millan (Dawg whisper),"

Facebook account made the below post regarding pills, which based upon their training

and experience, case agents believe to be ecstasy pills:



22.     On December 14, 2019, the account associated with HUDSON made the

below post with the caption, "A dead silence situation." The photograph appears to

depict two firearms, including the firearm on the left which appears to have a threaded

barrel, which is capable of receiving a silencer. Based upon their training, experience, and the investigation to date, case agents believe that the above caption is referencing the firearm's capability to receive a silencer.



23. On March 30, 2020, the "King'Cesar Millan, (Dawg whisper)" Facebook page, utilized by HUDSON, posted a picture of a large amount of United States Currency (USC) with the caption, "Any bank accounts tap in with me I a get you paid 3K plus and with the caption "Who Got Educators? #Tapin."  Case agents believe that this post is a solicitation to participate in a scheme to defraud Educator's Credit Union through fraudulent deposits into a checking account.  Case agents are aware, based upon training and experience, that individuals will engage in a "check kiting scheme," if they are aware that certain banks will make funds available immediately after a deposit.  Case agents aware that fraudsters will take advantage of the bank's policy by using an individual's checking account to deposit a counterfeit check and then immediately withdraw the funds that are made available by the bank before the bank can realize that the check is fraudulent.



24.     I have learned from multiple sources, including posts by Wild 100's members on social media, that the Wild 100's are engaged in multiple schemes to defraud unemployment insurance and COVID-19 relief programs. For example, I have seen posts and videos on social media where Wild 100's members use the State of California Employment Development Department (EDD) to file fictious unemployment claims in others' names. They will access the site, file a claim utilizing someone's date of birth, social security number, and phone number to file the claim. Most individuals will split the profits with the person for whom they are falsely filing the claim. Once the claim is approved, the individual committing the fraud will log into EDD and change the mailing address for the loaded debit card to a Milwaukee address. The individual will then withdraw the money from these loaded debit cards from an ATM and split the profits with the individual for whom they are filing the false claim.

25.     I am aware that on March 13, 2020, the President of the United States declared COVID-19 an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. As a result, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT"), which was signed into law by the

President on March 27, 2020. The CARES act provides over $2 trillion in economic relief protections to the American people from the public health and economic impacts of COVID-19.

26. Since 1935, the U.S. Department of Labor's Unemployment Insurance (UI) program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own. This program ensures that at least a significant part of necessary living expenses are provided on a weekly basis while the worker seeks employment. Unemployment insurance beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance. Each state administers a separate UI program within the guidelines established by federal law.

27. The CARES Act established a new program—Pandemic Unemployment Assistance (PUA)—to provide unemployment benefits during the COVID-19 pandemic to people who do not qualify for regular unemployment insurance benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic. Unemployment insurance benefits provided under the PUA program are sometimes referred to as PUA benefits. Each state's unemployment insurance office is responsible for distributing these benefits if available in that state.

28. On June 8, 2020, the "King'Cesar Millan, (Dawg whisper)" Facebook page, utilized by HUDSON, posts a photograph of blue pills consistent with ecstasy with the caption, "Wats left lmk Wtw". Based upon their training, experience, and the

investigation to date, case agents believe this is an offer by HUDSON to sell the remaining ecstasy pills that he has left and is asking if anyone is interested in purchasing them.



29.    On July 10, 2020, the account of HUDSON posted pictures of multiple bank account balances at various banks. Case agents believe that this post is a solicitation to participate in a scheme to defraud banks through fraudulent deposits into a checking account, as set forth above.

30.    10,                                    2020.





31.    On July 24, 2020, HUDSON posts a withdrawal receipt from BMO Harris

Bank showing an account balance.  Case agents believe that this post may constitute

evidence of the participation in the scheme to solicit witting or unwitting participants in the deposit of fraudulent checks into BMO Harris bank accounts.



32.     On August 11, 2020, HUDSON posted that he was "in traffic" and then responds with his phone number when someone posts and askes "where ya at."  Based upon their training, experience, and the investigation to date, case agents believe that HUDSON is posting that he is out selling drugs, as "traffic" is another term of stating that you are out in public selling drugs.



33. On August 28, 2020, reposted the following statement, reflecting HUDSON's affiliation with the Wild 100s street gang, aka Shark Gang.



34. On August 31, 2020, the account associated with HUDSON makes a post regarding "Money Monday" followed by pictures or ATMs, receipts, and cash. Case agents believe that this post may constitute evidence of the participation in the scheme to engage in unemployment insurance and COVID-19 relief program fraud and posting of the amounts of money recovered as proceeds from the fraud will also solicit additional participants in the fraud.



35. On September 25, 2020, HUDSON's Facebook page solicits responses from people with an Educator's Credit Union and offers those "some thousands right now." Case agents believe that this post may constitute evidence of the participation in the scheme to engage in unemployment insurance and COVID-19 relief program fraud or the "check kiting scheme" as set forth above.



36. On October 2, 2020, the United States Marshals Service (USMS) attempted to arrest HUDSON for outstanding warrants for a felony domestic battery. HUDSON fled from case agents in a Lincoln MKZ with license plate AJR1646, and in HUDSON's flight path, the USMS recovered a Glock model 23, .40 caliber pistol bearing serial number DXF389US. The USMS also discovered that an acquaintance of HUDSON's was driving a U-Haul moving truck, that was rented by HUDSON, and that was parked in the area. Law enforcement obtained a state search warrant for the Lincoln MKZ with license plate AJR1646 and the U-Haul truck. Inside the Lincoln MKZ with license plate AJR1646, law enforcement recovered the following: a clear plastic bag containing approximately 11.9 grams of a white powder that field tested positive for cocaine base; a clear plastic bag containing approximately16.9 grams of a substance that field tested positive for heroin and fentanyl; a clear plastic bag containing approximately 2.2 grams

of a fine white powder that field tested positive for fentanyl; a clear plastic bag containing approximately 13.5 grams of a brown, chunky substance that field tested positive for heroin; a gum wrapper containing approximately 1.27 grams of a brown, chunk substance that field tested positive for heroin; a gum wrapper containing approximately .42 grams of a crystal, salt-like substance that field tested positive for methamphetamine; a clear plastic bag containing approximately .88 grams of a brown, chunky substance that field tested positive for heroin; five (5) pills weighing approximately 1.09 grams that field tested positive for methamphetamine; a CZ, model Scorpion EVO 3S1 pistol, bearing serial number C018609 with 16, live 9mm rounds in the magazine; mail addressed to HUDSON, a box of .40 caliber ammunition, and a black digital scale. A search of the U-Haul truck revealed the following: a Smith & Wesson pistol magazine; a Social Security Card for HUDSON, and a U-Haul rental agreement listing HUDSON's name and phone number 414-397-2827.

37.     In a post-arrest *Mirandized* interview with MPD detectives, HUDSON admitted that he was a member of the Wild 100s street gang and confirmed he had Wild 100s tattoos. HUDSON also confirmed the above Lincoln MKZ belonged to him.

38.     HUDSON was detained in the Milwaukee County Jail since his October 2, 2020 arrest, however, the Facebook account remained active with publicly viewable posts consistent with the solicitation of individuals to commit fraud. Case agents are aware based upon training and experience, that prisoners can obtain access to social media via the internet from smart phones smuggled into the jail. Additionally, some prisoners will provide username and password via jail calls to conspirators who are not incarcerated to use their Facebook account while incarcerated. From February 18, 2021,

until April 4, 2021 the Facebook account "King'Cesar Millan"made the below posts. Case agents believe that these posts constitute evidence of the participation in the scheme to engage in unemployment insurance and COVID-19 relief program fraud or the "check kiting scheme" as set forth above.



39.     Based upon their training, experience, and the investigation to date, case agents believe that based on the public images displayed above, there may be additional evidence of federal violations of firearm possession, possession with intent to distribute controlled substances, theft of government property and evidence of wire and mail fraud located within the private portions of the three Facebook pages listed above. Case agents are aware based upon their training and experience that individuals will utilize different means of Facebook communication (Facebook messenger) and private Facebook messaging to obtain, transfer, and discuss the use and possession of firearms;

the possession and distribution of controlled substances, and the involvement in a scheme to commit theft of government property and fraud.

40.     Based upon their training and experience and the evidence set forth above, case agents believe probable cause exists that the Facebook account "King'Cesar Millan" contains evidence of violations of 18 U.S.C § 922(g)(1) (felon in possession of a firearm), 21 U.S.C. § 841 (manufacture/delivery of a controlled substance), and 18 U.S.C. § 641 (theft of government property), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1343 (bank fraud).  Information in these accounts may contain both evidence of these crimes and may also contain evidence that will further the investigation by assisting agents in identifying others involved in the illegal transfer and possession of firearms, distribution of controlled substances, and those involved in bank fraud, wire fraud, and theft of government property.

**TECHNICAL BACKGROUND**

41.     Case agents are aware that Facebook accounts store communications and pictures that will assist case agents in making connections to people and places involved in the suspected illegal possession of firearms.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

42.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This

information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

43. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

44. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

45. Facebook users can create profiles that include photographs, lists of

personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

46. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

47. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a

specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

48. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

49. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

50. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

51. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

52. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

53. The Facebook Gifts feature allows users to send virtual "gifts" to their

friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

54.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

55.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

56.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

57.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items;

Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

58.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

59.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

60.     As explained herein, information stored in connection with a Facebook

account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

 In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For

example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

61.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

62.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

63.    Based on my training, experience and consultation with other agents familiar with electronic crimes investigations, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of a crime.

64.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a),

(b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

65.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

# <u>ATTACHMENT A</u>

## Property to Be Searched

This warrant applies to information between November 1, 2019 and present date associated with the following Facebook page:

- Facebook page under the URL: https://www.facebook.com/Mr.Wild.Hunnitz

  Username: King'Cesar Millan (Dawg whisper)

  User ID: 738415029

That are stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**Information to be disclosed by Facebook**

1.      To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.    All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    c.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

    d.    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event

postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.  All "check ins" and other location information;

g.  All IP logs, including all records of the IP addresses that logged into the account;

h.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.  All information about the Facebook pages that the account is or was a "fan" of;

j.  All past and present lists of friends created by the account;

k.  All records of Facebook searches performed by the account;

l.  All audio messages sent by the account and messages received by the account;

m.  All video messages sent by the account and to the account;

n.  Any and all location data that is recorded by Facebook related to the account

o.  All information about the user's access and use of Facebook Marketplace;

p.  The types of service utilized by the user;

q. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

1. All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C § 922(g)(1) (felon in possession of a firearm), 21 U.S.C. § 841 (manufacture/delivery of a controlled substance), and 18 U.SC. §§ 641(theft of government property), 1343, (wire fraud), and 1343 (bank fraud).

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

c. Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

d.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e.  The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.